**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Case No. 15-cv-01602-RM-CBS

THERESA CHAVEZ,

      Plaintiff,

v.

STATE OF COLORADO, DEPARTMENT OF EDUCATION, *et al.*,

      Defendants.

---

## OPINION AND ORDER

---

On July 27, 2015, Plaintiff Theresa Chavez ("plaintiff") filed a Complaint against Defendants the State of Colorado Department of Education ("the CDE"), Colleen O'Neil ("O'Neil," and with the CDE, "defendants"), Jill Hawley ("Hawley"), and Norma Lawanson ("Lawanson"), asserting the following six claims for relief: (1) religious discrimination, hostile work environment, and retaliation against the CDE in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) disability discrimination, hostile work environment, interference, and retaliation against the CDE in violation of the Rehabilitation Act of 1973; (3) under 42 U.S.C. § 1983, violation of the Establishment and Free Exercise Clauses of the First Amendment to the U.S. Constitution against Lawanson, O'Neil, and Hawley; (4) violation of the Family Medical Leave Act ("the FMLA") against O'Neil; (5) coercion against Lawanson; and (6) breach of a settlement agreement against the CDE. (ECF No. 1.)

After the filing of motions to dismiss (ECF Nos. 22, 25), the Court dismissed all claims against Lawanson and Hawley, and dismissed the claims under § 1983 against O'Neil (ECF No. 75). The Court also denied without prejudice O'Neil's motion to dismiss with respect to the FMLA claim. (ECF No. 75.)

Currently pending before the Court is defendants' motion for summary judgment ("the motion") (ECF No. 72), pursuant to which defendants seek summary judgment as to all remaining claims. Plaintiff has filed a response (ECF No. 85), and defendants have filed a reply (ECF No. 90.)

## I.   Legal Standard

Summary judgment is appropriate "when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  Initially, the movant bears the "responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).  If this burden is met, then the non-moving party must set forth specific facts showing that there is a genuine dispute for trial. *Id*. at 324.  A fact is material if it has the potential to affect the outcome of a dispute under applicable law. *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995).  An issue is genuine if a rational trier of fact could find for the non-moving party. *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

In performing this analysis, the factual record and any reasonable inferences therefrom are construed in the light most favorable to the non-moving party. *Id*.  However, a mere "scintilla of evidence" is insufficient to avoid summary judgment. *Turner v. Public Service Co. of Colorado*, 563

F.3d 1136, 1142 (10th Cir. 2009).  Instead, a non-movant "must proffer facts such that a reasonable jury could find in her favor."  *Id.*

## II.     Factual Background

As an initial matter, the Court addresses one of the frequent objections plaintiff raises with respect to certain facts in defendants' initial statement of uncontested material facts: "[t]he evidence relied on in support of this fact does not meet the standards required by [Fed.R.Civ.P.] 56."  (*See, e.g.*, ECF No. 85-1 at ¶ 1-5.)  Plaintiff cites to Fed.R.Civ.P. 56 ("Rule 56"), subsection (e), which she contends states, *inter alia*, that affidavits must be made on personal knowledge and set out facts that would be admissible in evidence.  (*Id.* at ¶ 1.)  Plaintiff also cites a case, which states that a court may disregard facts supported only by references to documents unless the document has been authenticated by an affidavit.  (*Id.*)

The problem for plaintiff is that she is citing to an *old* version of Rule 56(e).  Rule 56(e) was amended as of December 2010, and now pertains to the consequences of failing to properly support or address a fact.  *See* Fed.R.Civ.P. 56(e) (2010).  The pertinent provision for the objection plaintiff raises is now Rule 56(c)(2).  That provision pertains to when an objection is made that a fact is not supported by admissible evidence, and states, simply, that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  *See* Fed.R.Civ.P. 56(c)(2) (2010).  Plaintiff does not raise that objection to the evidence relied upon by defendants; plaintiff's sole objection is that the evidence has not been authenticated by way of an affidavit.  That, however, is not a requirement under Rule 56; the only requirement is that the evidence be presented in an admissible form.  *See Alfonso v. SSC Pueblo Belmont Operating Co., LLC*, 2012 WL 2863128, at \*1-2 (D. Colo. July 11, 2012) (explaining the changes caused to

Rule 56 by amendments in 2010, and rejecting a party's authentication argument where a sufficient method had been proposed by which an exhibit might be admitted at trial).

Here, the Court can discern no reason why the evidence in question is not in an admissible form, especially given that, except in one instance, defendants have subsequently filed affidavits substantiating the evidence. *See id.*; *see, e.g.*, ECF No. 90-1 at ¶¶ 10-15; ECF No. 90-10 at ¶¶ 13-15; ECF No. 90-15 at ¶¶ 9-12.)  Based upon the Court's review of defendants' affidavits, the one example of evidence not authenticated by the same are the emails related to the alleged settlement agreement between the parties.  However, the Court has no problem believing that those emails are in admissible form, given that the email exchange is between counsel for CDE and plaintiff's current counsel.  It should be little problem for the parties to stipulate or for CDE to present a witness to testify as to whether or not Exhibit Z (ECF No. 72-28) does, in fact, represent the actual email exchange between counsel, especially given that plaintiff does not argue that Exhibit Z does not, in fact, represent the exchange.  (*See* ECF No. 91-1 at ¶ 60; ECF No. 85 at 40.)

As a result, the Court rejects plaintiff's objections premised on an out-dated version of Rule 56, and, to the extent no other objection is raised, considers defendants' proposed facts, that plaintiff challenges on that out-dated basis, as uncontested for purposes of the motion.  *See* Fed.R.Civ.P. 56(e)(2).

With that in mind, the following factual background is drawn from the parties' statements of fact.[1]

---

[1] For citation purposes, the Court cites to only the reply statement of undisputed material facts(ECF No. 91-1), as, consistent with this Court's Civil Practice Standards, it contains defendants' initial statement of uncontested material facts, plaintiff's response statement of uncontested material facts, and defendants' reply statement.

In February 2009, CDE hired plaintiff to work in the Educator Licensing Unit as an Administrative Assistant III. (ECF No. 91-1 at ¶ 1.) Work in the Educator Licensing Unit includes implementation and compliance oversight for educator licensing programs in Colorado. (*Id*. at ¶ 2.) On March 13, 2009, plaintiff signed a Position Description Questionnaire that detailed the duties of her role in the Educator Licensing Unit. (*Id*. at ¶ 3.) Plaintiff was also assigned various roles that were not specifically identified in the Position Description Questionnaire. (*Id*. at ¶ 1(AF).)[2] Plaintiff was tasked with assisting clients with the licensure application process and processing licensure applications. (*Id*. at ¶ 4.) Seventy percent of plaintiff's job was centered around customer service. (*Id*. at ¶ 5.)

Between 2009 and 2012, CDE assigned plaintiff to assist Lawanson, a supervisor of the evaluator team. (ECF No. 91-1 at ¶ 11.)[3] At times, Lawanson was a supervisor of the evaluators, and, at times, plaintiff's supervisor. Lawanson remained plaintiff's direct supervisor through approximately July 2013. (*Id*.) Lawanson also remained in plaintiff's supervisor chain until January 2014, which, in part, meant that Lawanson supervised plaintiff when plaintiff's direct supervisor was absent. (*Id*; ECF No. 72-33 at 2; ECF No. 85-2 at ¶ 8.) While working for Lawanson, plaintiff expressed an interest in becoming an evaluator after Lawanson indicated that she would train plaintiff to become an evaluator. (ECF No. 91-1 at ¶ 13.) Lawanson allowed plaintiff to perform evaluator tasks. (*Id*. at ¶ 14.) Plaintiff's evaluator duties included evaluating applications for one-

---

[2] To differentiate between plaintiff's and defendants' statements of facts, the Court places the initials "(AF)" after the additional factual statements proposed by plaintiff.

[3] The parties dispute whether plaintiff acted as Lawanson's personal assistant. (ECF No. 91-1 at ¶ 2(AF).)

year substitute licenses and processing three-year substitute authorizations. Lawanson rated plaintiff favorably on all evaluator duties. (*Id*.)

In 2009, plaintiff received a negative performance review. (ECF No. 91-1 at ¶ 6.) More specifically, on August 10, 2009, plaintiff received a document reflecting her poor performance of data entry, being rude to clients, and providing inaccurate information to clients. (*Id*. at ¶ 7.) In September 2009, plaintiff received a "Needs Improvement" rating, and failed her Core Competencies Inventory on her employee performance evaluation form. (*Id*. at ¶ 8.) From 2010 through March 2013, plaintiff received favorable performance reviews. (*Id*. at ¶ 6.) More specifically, Lawanson rated plaintiff as "Fully Competent" in her November 2011 to March 2012 performance rating (*id*. at ¶ 3(AF)), and plaintiff received an overall rating of "Meets Expectations" for her performance from April 2012 to March 2013 (ECF No. 85-5 at 7-8).[4] The 2012-2013 performance review was signed by Lawanson and Dr. Jami Goetz ("Goetz"), the Executive Director of the Educator Licensing Unit. (*Id*. at 2; *see also* ECF No. 91-1 at ¶ 6.) In plaintiff's April 2013 to March 2014 performance review, she received an overall rating of "Needs Development." (ECF No. 72-44 at 10.)

On January 19, 2010, CDE approved plaintiff's FMLA request for intermittent abdominal pain. (ECF No. 91-1 at ¶ 9.) On September 20, 2010, CDE approved a FMLA request from plaintiff. (*Id*. at ¶ 10.) On February 27, 2012, and July 26, 2012, CDE approved further FMLA requests from plaintiff. (*Id*. at ¶¶ 15, 25.)

---

[4] Defendants assert that Lawanson found plaintiff's performance did not improve while Lawanson supervised her. (ECF No. 91-1 at ¶ 31.) First, the *actual* performance review (ECF No. 85-5) contradicts any such statement. Second, the evidence to which defendants cite does not support their factual statement, as that evidence either pertains to a time after Lawanson supervised her (ECF No. 72-9), does not relate to what Lawanson found (ECF No. 72-11), or does not relate to plaintiff's performance (ECF No. 72-16 at 9). The same is true of defendants' assertions that plaintiff's error rates were high. (ECF No. 91-1 at ¶¶ 32-34, 38.) Any such assertion simply contradicts plaintiff's performance review.

On February 8, 2013, plaintiff's doctor diagnosed her with thyroid cancer. (*Id*. at ¶ 35.) On March 13, 2013, plaintiff had a complete thyroidectomy to remove the cancer. (*Id*. at ¶ 36.) Plaintiff returned to work in the first week of April 2013. (*Id*. at ¶ 37.) After returning to work, plaintiff no longer wanted to be involved in Lawanson's church or church related activities, and no longer wanted to attend Bible studies at work. (*Id*. at ¶ 10(AF).) At some point, Lawanson expressed her disapproval. (*Id*. at ¶ 11(AF).)[5] Lawanson became angry with plaintiff, and withdrew her support for plaintiff. (*Id*. at ¶ 12(AF).) Lawanson also told co-workers not to speak with plaintiff. (*Id*.) Lawanson still pressured plaintiff to attend Bible study and other church related functions. (*Id*. at ¶ 13(AF).) The day after plaintiff failed to attend the first session of a church sponsored parenting class, Lawanson called plaintiff a "hypocrite" and told her that she needed to "realize who is number one, God, not your family." (*Id*. at ¶ 14-15 (AF).)

At some point in 2013, CDE decided to move plaintiff to the Customer Service Center to answer phones. (ECF No. 91-1 at ¶¶ 38, 13(AF).)[6] Plaintiff was not added to the Avaya phone system until after May 30, 2013. (*Id*. at ¶ 17(AF).) Soon after the move, plaintiff complained that Lawanson retaliated against plaintiff because she was no longer attending religious activities with

---

[5] Although plaintiff asserts in her affidavit that she told Lawanson that she would no longer go to church, in her deposition testimony she stated that she did not tell Lawanson, but Lawanson found out when she did not go to church. (*See* 90-16 at 46:17-24.) Unrelatedly, the Court notes that, for deposition transcripts, the Court cites the page number assigned by the transcript itself, rather than by the CM/ECF system.

[6] The reason for why CDE moved plaintiff to the Customer Service Center is disputed. (*See* ECF No. 91-1 at ¶ 38.) Plaintiff asserts that, after being reassigned, she lost the "prestige" of being Lawanson's assistant and there were no professional growth opportunities at the service center. (*Id*. at ¶ 18(AF).) However, neither assertion is supported by any evidence that there was any actual prestige to working with Lawanson or that there were a lack of professional growth opportunities at the service center. Plaintiff's affidavit fails to explain what prestige or growth opportunities she lost. (*See* ECF No. 85-2 at ¶ 20.)

Lawanson.  (*Id.* at ¶ 39.)[7]  Goetz told Lawanson to discontinue Bible studies, and Lawanson cancelled the same.  (*Id.* at ¶¶ 44-45.)[8]  Lawanson also limited her interactions with plaintiff, and their friendship deteriorated.  (*Id.* at ¶¶ 47-48.)

On June 10, 2013, plaintiff's doctor submitted a Fitness to Return Certification, limiting plaintiff's telephone work to two-three hours per day, non-consecutively.  (*Id.* at ¶ 49.)  The doctor's certification was to end on December 10, 2013.  (*Id.*)  On June 17, 2013, CDE approved plaintiff's FMLA request for severe abdominal pain.  (*Id.* at ¶ 50.)

On June 5, 2013, plaintiff met with Goetz, and complained about Lawanson's Bible studies. (*Id.* at ¶ 19(AF).)  On June 10, 2013, Lawanson circulated a telephone schedule that had plaintiff on the telephone from 8:30 a.m. to 4:00 p.m.  (ECF No. 85-12 at 3.)  On the same day, plaintiff complained to Goetz about the schedule, saying that she felt Lawanson was retaliating against her. (ECF No. 91-1 at ¶ 21.)  On June 11, 2013, Lawanson sent an email with changes to the telephone schedule.  (ECF No. 72-16 at 24.)  A chart attached to the email, containing the schedule, was not changed though (*id.* at 25), and Lawanson could not recall which schedule was followed (ECF No. 90-10 at ¶ 11).  On June 12, 2013, Lawanson sent out another phone schedule, placing plaintiff on the telephone from: 8:30 a.m. to 9:30 a.m. on Wednesday, and 8:30 a.m. until 10:00 a.m. the rest of the work week; 11:30 a.m. to 1:00 p.m. on Wednesday, and 11:00 a.m. to 1:00 p.m. the rest of the

---

[7] It is disputed whether plaintiff complained that she was being discriminated against due to her religion.  (*See* ECF No. 91-1 at ¶ 41.)  The evidence to which defendants cite only supports the contention that, in Goetz's mind, plaintiff did not complain about being discriminated against due to her religion.

[8] Plaintiff's response to factual statement 44 does not, in fact, respond to that statement.  (*See* ECF No. 91-1 at ¶ 44.)

work week; and 2:00 p.m. to 3:00 p.m. on Wednesday, and 2:30 p.m. to 4:00 p.m. the rest of the work week.  (ECF No. 85-14 at 2-6.)[9]

On July 11, 2013, plaintiff complained to human resources about the lack of compliance with her medical restrictions.  (*Id*. at ¶ 25(AF).)  Human resources responded that they would need a completed medical certification form from plaintiff's doctor with respect to her thyroid condition if she wanted to take time off for that condition.  (*Id*.)  A day later, human resources also responded that the medical certification they had did not put any restrictions on plaintiff's ability to perform her job.  (*Id*. at ¶ 26(AF).)  Plaintiff complained three times during a five-month period that CDE did not comply with her medical restrictions.  (*Id*. at ¶ 27(AF).)  Plaintiff was "emotionally and physically traumatized" by CDE's actions in scheduling her on the phone in excess of her medical restrictions, which "aggravated" her surgery site.  (ECF No. 85-2 at ¶ 32.)[10]

On July 15, 2013, plaintiff met with Hawley, and stated that she was being treated unfairly because she had complained about Lawanson's Bible studies.  (ECF No. 91-1 at ¶¶ 51-52.)  As a result, Hawley determined that plaintiff should have a new supervisor, Chris Lee ("Lee").  (*Id*. at ¶ 54.)

---

[9] Defendants dispute this factual statement as immaterial because Lawanson purportedly changed the telephone schedule.  However, the email to which defendants cite is dated June 11, 2013 (*see* ECF No. 72-16 at 24), whereas the email to which plaintiff cites is dated June 12, 2013—one day later (*see* ECF No. 85-14 at 2).  It is thus very hard to understand how Lawanson's June 11 email corrected a deficiency in a later sent email.

[10] Although the Court understands defendants' objection to this factual statement on the ground that it is argument of counsel (*see* ECF No. 91-1 at ¶ 28(AF)), the statement is within plaintiff's affidavit, and defendants have not presented any evidence to rebut it.  Thus, at this juncture, the Court will accept it.

In late July 2013, plaintiff allegedly left confidential, unsecured information in the office. (*Id.* at ¶ 55.)[11]  As a result, plaintiff received a Corrective Action on August 1, 2013.  (*Id.*)  Plaintiff appealed the Corrective Action, and, on August 23, 2013, Hawley changed the Corrective Action to a written warning.  (*Id.* at ¶ 56-57.)[12]

On August 12, 2013, Lawanson received a complaint from a customer, which indicated that the complaint was about a woman.  (*Id.* at ¶ 29(AF).)  Lawanson sent an email to Klein, stating "[l]et the fun begin … the only woman on the phones this morning was [plaintiff]."  (*Id.*)  On August 13, 2013, plaintiff complained about being retaliated against by Lawanson's behavior concerning religion.  (*Id.* at ¶ 30(AF).)  Plaintiff further complained that the Corrective Action issued on August 1, 2013 was "issued as a means to start the path to [her] termination."  (*Id.*; ECF No. 85-19 at 2.)

On August 14, 2013, plaintiff filed a formal grievance against Lawanson and Lee, alleging discrimination, retaliation, and harassment.  (*Id.* at ¶ 59.)  Plaintiff further complained about her telephone schedule, stating that she wanted to stop answering telephones "all day long," and she could not do so for more than a few hours per day or for consecutive hours.  (*Id.* at ¶ 31(AF).)  Settlement negotiations with respect to the grievance began in February 2014.  (*Id.* at ¶ 60.)[13]  On September 12, 2013, plaintiff filed her first charge with the Equal Employment Opportunity

---

[11] It is disputed whether plaintiff did, in fact, leave confidential information in the office.  (*See* ECF No. 91-1 at ¶ 55.)

[12] Defendants assert that Hawley also concluded that plaintiff did leave confidential information unsecured.  (ECF No. 91-1 at ¶ 58.)  The exhibit and pages to which defendants cite, though, do not state that Hawley concluded the same.

[13] Whether the parties' settlement negotiations resulted in an actual settlement agreement is discussed *infra*.

Commission ("EEOC"), alleging retaliation, age discrimination, disability discrimination, and religious discrimination. (*Id*. at ¶ 62.) Plaintiff attached the formal grievance filed against Lawanson and Lee to her EEOC charge. (*Id*. at ¶ 63.) In responding to plaintiff's charge of discrimination, CDE responded that its failure to follow plaintiff's medical restriction was "in error." (*Id*. at ¶ 34(AF).)

In August 2013, Tanya Klein ("Klein") became plaintiff's supervisor. (*Id*. at ¶ 67.) Klein did not participate in or know about the Bible studies until after they ended. (*Id*. at ¶ 68.) On October 24, 2013, Klein sent an email revising plaintiff's telephone schedule, stating that her prior understanding of plaintiff's restrictions was "incorrect" and that she now understood plaintiff as being restricted to 2-3 non-consecutive hours of telephone duties per day. (*Id*. at ¶ 33(AF).)

Toward the end of November 2013, Klein, who was out of the office, sent an email, directing plaintiff to "sit at the desk across from Michael so that you can overhear what's going on and assist with walk ins." (ECF No. 72-30 at 2.)[14] On December 3, 2013, plaintiff wrote a complaint to Wendi Kispert ("Kispert"), the Human Resources Director, stating that Lawanson and Klein were harassing and retaliating against her. (*Id*. at 7-9.) In January 2014, Lawanson resigned from CDE. (ECF No. 91-1 at ¶ 80.)

---

[14] Defendants assert that Klein's email amounted to a training opportunity for plaintiff, as well as that Lawanson attempted to move plaintiff's work station when plaintiff refused. (ECF No. 91-1 at ¶¶ 69-70.) Klein's email (ECF No. 72-30 at 2) does not support the inference that her instructions were a training opportunity for plaintiff, at least not when viewed in the light most favorable to plaintiff. Although Klein's affidavit states that her instructions in the email were a training opportunity (ECF No. 72-11 at ¶ 35), based on the record, that is merely Klein's construction of her instructions, it is not what plaintiff was told. As for Lawanson attempting to move plaintiff's work station, the page to which defendants cite does not support this assertion. (*See* ECF No. 72-30 at 2.)

On December 6, 2013, plaintiff's doctor sent a medical certification to CDE related to a chemical imbalance in plaintiff's brain nerves. (ECF No. 91-1 at ¶ 75.) On December 9, 2013, CDE approved a FMLA request related to the same. (*Id*.; ECF No. 72-31 at 1.)

In December 2013, O'Neil took over the role of Executive Director. (*Id*. at ¶ 76.) On December 23, 2013,[15] plaintiff met with O'Neil and Klein to address plaintiff's incident report about Klein's email, plaintiff's FMLA and work restrictions, plaintiff's job duties, plaintiff's October 10, 2013 Performance Management and Growth Plan, and work space requests made by plaintiff's doctor. (*Id*. at ¶ 78.)[16]

In December 2013, O'Neil heard that customers were complaining about excessive wait times, and O'Neil started to look into the problem. (*Id*. at ¶ 35(AF).) Beginning in mid to late February 2014, O'Neil heard from employees that customers were frustrated with the call center, and that customers would wait "quite a while on the phone and then be disconnected." (*Id*. at ¶ 36(AF).) CDE investigated the issue, working with Avaya for about two months. (*Id*. at ¶¶ 36, 42(AF).) In February 2014, O'Neil knew that Justin McGrew ("McGrew"), Michael Logan, Joyce Grange ("Grange"), and plaintiff were all reporting customer frustration. (*Id*. at ¶ 37(AF).) O'Neil was aware of various concerns, including wait time, being disconnected, and customers not getting the right answers. (*Id*. at ¶ 41(AF); ECF No. 85-10 at 31:8-16.) O'Neil's conversations with customer service staff concerned customers being disconnected. (*Id*. at ¶ 42(AF).) In March 2014, the

---

[15] Defendants assert that the meeting took place on December 29, 2013. (ECF No. 91-1 at ¶ 78.) Although the memorandum summarizing the meeting was dated December 29, 2013, the memorandum reflects that the meeting took place on December 23, 2013. (ECF No. 72-33 at 1.)

[16] Defendants also assert that, during a conversation between O'Neil and plaintiff, plaintiff confirmed that there was no negative treatment happening at the time of the meeting. (ECF No. 91-1 at ¶ 77.) The page of the exhibit to which defendants cite, however, does not support such a statement. (*See* ECF No. 72-33 at 1.)

telephone problems were ongoing, but O'Neil had not found any of the problems to be associated with any particular employee. (*Id.* at ¶ 43; ECF No. 85-10 at 44:4-20.)[17]  After March 2014, CDE added additional customer service employees, Emma Craighead ("Craighead") and Sabrina Perkins, who also reported customer complaints. (*Id.* at ¶ 40(AF).)

On January 7, 2014, CDE's Human Resources emailed plaintiff, and told her that leave from December 3 to December 6, 2013 would not be covered under the FMLA, and that "[f]or any FMLA related illness, a reason must be specified to be covered under FMLA." (ECF No. 72-34 at 1.)  In early March 2014, plaintiff told O'Neil that she would not provide information concerning the specific medical condition to which her FMLA leave was related because, according to human resources, she was not required to do so. (ECF No. 85-2 at ¶ 46.)[18]

At some point in early 2014, plaintiff was late to work without notifying her direct supervisor Klein or O'Neil. (ECF No. 72-35 at 2.)[19]  O'Neil did not refuse to approve any of plaintiff's absences. (*Id.* at ¶ 84.)

Plaintiff did not receive any disciplinary actions between December 2, 2013 and March 10, 2014. (ECF No. 91-1 at ¶ 85.)  However, on March 6, 2014, Darrin Bacca ("Bacca"), a customer

---

[17] The Court notes that the language in plaintiff's factual statement 44 is not contained in the cited portion of the deposition transcript. (*See* ECF No. 91-1 at ¶ 44.)  The Court further notes that plaintiff cites to lines 16 to 6 of page 48 of the transcript. (*Id.*)

[18] Although plaintiff also asserts that this conversation with O'Neil amounted to "protected activity" (ECF No. 91-1 at ¶ 49), that is simply argument of counsel, not a factual statement.

[19] Defendants assert that plaintiff was late "multiple" times. (ECF No. 91-1 at ¶ 82.)  The email to which defendants cite, though, does not support such an assertion; it only supports that "[l]ast week when [plaintiff was] tardy to work …," which suggests that plaintiff was late only once. (*See* ECF No. 72-35 at 2.)  The email also does not support defendants assertion that plaintiff agreed to provide her supervisors a schedule of her doctor's appointments. (*See* ECF No. 91-1 at ¶ 83.)  Instead, the email only supports O'Neil's understanding that plaintiff would create a document indicating when she would be out for doctor's appointments. (*See* ECF No. 72-35 at 2.)

service representative, sent an email to O'Neil regarding plaintiff's errors when uploading documents for teacher licenses. (*Id.* at ¶ 86; ECF No. 72-36 at 1.) O'Neil asked Bacca to identify problems with plaintiff's performance; something which, at any given time, O'Neil asked Bacca to do with all employees. (ECF No. 85-10 at 137:24-138:19.)

Klein approved plaintiff's January 2014 time sheet. (ECF No. 91-1 at ¶ 48(AF).)[20] O'Neil evaluated plaintiff's time in and time out based on when plaintiff signed into her computer. (*Id.*)[21] On plaintiff's February 2014 time report, it states that plaintiff was ill due to stomach sickness on February 14 and February 27. (ECF No. 85-25 at 2.) On March 7, 2014, plaintiff and O'Neil reviewed plaintiff's time sheet. (ECF No. 91-1 at ¶ 50(AF).) On March 10, 2014, O'Neil submitted the time sheet on plaintiff's behalf. (*Id.*) On the same day, O'Neil gave plaintiff a Request for Action, outlining plaintiff's violation of the absence/tardy protocols and the errors she made with uploading and processing documents. (*Id.* at ¶ 87.) On March 14, 2014, O'Neil issued plaintiff a Corrective Action for falsifying her time sheets and failing to correctly use the "Avaya" phone system. (*Id.* at ¶ 88.)[22]

---

[20] In additional factual statement 47, plaintiff cites to pages 125 and 126 of exhibit 23 to support, *inter alia*, her contention that Klein told plaintiff that she could work during her lunch or breaks to make up time. (ECF No. 91-1 at ¶ 47.) There are, however, no pages 125 or 126 in exhibit 23 submitted to the Court. (*See* ECF No. 85-24 at 118-127.) Therefore, the Court does not credit the factual statements relying on those pages of the exhibit. In any event, as defendants contend, the March 14, 2014 Corrective Action took into account that plaintiff worked through her lunches and breaks. (*See* ECF No. 72-38 at 1.)

[21] Plaintiff states that signing in or out of her computer did not accurately reflect the time that employees worked. (ECF No. 91-1 at ¶ 48(AF).) However, other than an identical statement in her affidavit, plaintiff fails to explain why her computer failed to accurately reflect the time she worked or provide any evidence of the same. Therefore, the Court finds this factual statement insufficiently supported.

[22] It is disputed whether plaintiff, in fact, falsified her time sheets or incorrectly used the Avaya phone system. (*See* ECF No. 91-1 at ¶ 88.)

O'Neil believed that the Request for Action and Corrective Action were necessary after several months of trying to get plaintiff to improve her performance to no avail. (ECF No. 72-32 at ¶ 14.)[23] Prior to the March 14, 2014 Corrective Action, plaintiff did not receive any "coaching," and there were no discussions about her improving her performance. (ECF No. 91-1 at ¶ 51.)[24] Klein could not recall telling plaintiff whether plaintiff was logging in or out of the Avaya system correctly. (*Id*. at ¶ 52.) Klein also did not go to plaintiff's desk and show her how to log in and out. (*Id*.) After a meeting on March 17, 2014, O'Neil sent plaintiff an email outlining their meeting, and offering to talk about additional support, training, or suggestions to assist plaintiff in being successful in her work duties. (ECF No. 91-1 at ¶ 90.) Plaintiff replied to the email 13 days later, saying "Thank you." (*Id*. at ¶ 91.)

Plaintiff wrote a letter, dated March 21, 2014, to O'Neil, responding to the Request for Action, and complaining of retaliation due to filing complaints and being susceptible to stress from a hostile work environment. (ECF No. 85-26 at 2-3.)[25] On March 24, 2014, plaintiff sent O'Neil a response to the March 14 Corrective Action, asserting that she was being retaliated against due to

---

[23] It is disputed whether plaintiff received any help to improve her performance. (*See* ECF No. 91-1 at ¶ 89.) It is also disputed whether Klein provided plaintiff with multiple one-on-one training sessions and/or assistance. (*See id*. at ¶ 104.) Plaintiff also asserts that Klein did not recommend a Corrective Action in March 2014. (*Id*. at ¶ 53(AF).) However, page 129 of the exhibit to which she cites does not exist in the record, (*see* ECF No. 85-24 at 128-137), and page 128 alone does not support this fact (*see id*. at 128:20-25.)

[24] Defendants appear to dispute this response statement from plaintiff, but the exhibit and language to which they cite is far too general to refute plaintiff's specific statement that she did not receive any "coaching." (*See* ECF No. 91-1 at ¶ 51.) On the other hand, plaintiff also asserts in this factual statement that Klein had no problems with the manner in which plaintiff logged in or out of the Avaya system. (*Id*.) The deposition testimony to which she cites, however, does not support that statement, as Klein testified that she did not "track" or "look at" whether employees logged in or out of the Avaya system. (*See* ECF No. 85-24 at 127:14-25.)

[25] Plaintiff asserts that her letter amounted to engaging in protected activity (ECF No. 91-1 at ¶ 54(AF)), however, that is simply argument of counsel, not a factual statement.

complaints she had made about former supervisors and CDE.  (*Id*. at ¶ 92.)  On the same day,

plaintiff submitted an informal grievance to O'Neil.  (*Id*. at ¶¶ 93, 55(AF).)  The grievance

complained of retaliation, harassment, and bullying from O'Neil and Klein due to plaintiff's

complaint about former supervisors and CDE.  (*Id*.)  On April 2, 2014, O'Neil and Klein responded

to the informal grievance.  (*Id*. at ¶ 94.)[26]  On the same day, plaintiff filed a Charge of Discrimination

against the EEOC, alleging discrimination based on religion, disability, and retaliation from April

2013 through April 2014.  (*Id*. at ¶ 95.)  On April 6, 2014, plaintiff told CDE that she would continue

her grievance.  (ECF No. 85-2 at ¶ 53.)[27]  At the end of April, O'Neil became aware of an

investigation by the Colorado Civil Rights Division.  (*Id*. at ¶ 57(AF).)  On May 1, 2014, O'Neil was

notified of plaintiff's formal complaint regarding harassment against her.  (*Id*.)

On April 14, 2014, CDE approved plaintiff's FMLA request related to her thyroid.  (*Id*. at

¶ 98.)

On April 27, 2014, O'Neil gave plaintiff her 2013-2014 Performance Management and

Growth Plan, which had an overall rating of "Needs Development."  (ECF No. 91-1 at ¶ 99.)  On the

same day, O'Neil gave plaintiff a Corrective Action.  (ECF No. 72-45 at 12.)  In the Corrective

Action, O'Neil stated that she expected plaintiff to, *inter alia*, correctly insert her signature line in

emails, have less than one grammatical error per every two communications with customers, respond

comprehensively to questions in emails, and, unless plaintiff was unable to resolve an issue by email,

---

[26] Defendants assert that O'Neil and Klein's response "emphasiz[ed] Plaintiff's performance issues."  (ECF No. 91-1 at ¶ 94.)  The Court considers that assertion, though, simply counsel's characterization of the response, rather than a fact for purposes of the motion.

[27] In her factual statement, plaintiff asserts that this event took place on April 6, 2014.  (ECF No. 91-1 at ¶ 56(AF).)  The affidavit to which she cites states that the event occurred on April 26, but the letter to which the affidavit cites is dated April 6, 2014.  (*See* ECF No. 85-2 at ¶ 53 (citing ECF No. 85-28 at 2-3.))  The Court uses the date of the letter.

not ask customers to call her by telephone when the customer had sent an inquiry via email.  (*Id*. at 12-13.)[28]  In an email attached to the Corrective Action, as an example of plaintiff asking a customer to phone her in response to an email inquiry, plaintiff asks a customer to call her when, in a previous email, the customer had told plaintiff he was deaf.  (*Id*. at 8-9.)[29]  The Corrective Action stated that "if there are additional or consistent work duty performance concerns, I will consider taking further corrective and/or disciplinary action, up to and including termination."  (ECF No. 91-1 at ¶ 112(AF).)  After receiving the Corrective Action and 2013-2014 Performance Plan, plaintiff sent Kispert a letter, alleging bullying and harassment from O'Neil.  (*Id*. at ¶ 105.)  On May 9, 2014, plaintiff submitted a response to her 2013-2014 Performance Plan, accusing O'Neil and Klein of harassment and retaliation.  (*Id*. at ¶ 106.)

---

[28] It is disputed whether plaintiff's employment status and benefits changed after receiving corrective actions or unfavorable performance reviews.  (*See* ECF No. 91-1 at ¶ 103.)

[29] The Court notes that both parties have filed and cited to exhibits that are not consecutively numbered.  For example, defendant's Exhibit AP is cited by way of bates numbering in the bottom right corner of the page, and those bates numbers jump from 732 to 967 to 449 to 968.  Plaintiff does the same thing in her Exhibit 33, jumping from page 36 to 29 to 42 to 38.  To say the least, the Court was not entertained by the parties' deficient pagination methods.  In the future, in this or any other case the Court forewarns counsel for the parties that the Court will not consider any document not numbered consecutively.

During the Spring of 2014, plaintiff served as a back-up to the call center.  (*Id*. at ¶ 45(AF).)[30]

Plaintiff's primary duties were to answer emails and assist walk-ins in the reception area.  (*Id*.)

Emma Craighead believed that plaintiff was to be lead walk-in support.  (*Id*. at ¶ 46(AF).)

In early May 2014, the average time that plaintiff was on the telephone was "the exact time

that it took for her telephone to ring, be transferred to a cisco voicemail message system, hear the

message, and then be disconnected."  (ECF No. 72-32 at ¶ 20.)[31]  Data also showed that plaintiff

received double the amount of telephone calls that other representatives received in a day.  (*Id*.)

O'Neil believed that this indicated that plaintiff was either not properly responding to inquiries or

was not answering the telephone at all.  (*See id*.)

On May 13, 2014, O'Neil sent out a message to the educator licensing unit, stating that the

CDE's phone system had been acting "a bit funny in the last few weeks," and that, even though she

thought the issues had been resolved, any new problems should be reported.  (ECF No. 91-1 at

¶ 60(AF).)  The problems were related to "disconnects and long wait times."  (*Id*. at ¶ 61(AF).)  CDE

had received complaints of this ilk prior to and after May 14, 2014.  (*Id*.)  Disconnected telephone

calls had been occurring since the end of February 2014.  (*Id*. at ¶ 67(AF).)  Klein believed that

---

[30] Defendants dispute this factual statement. (ECF No. 91-1 at ¶ 45.)  The evidence to which they cite, however, does not go as far as defendants contend.  Specifically, defendants cite an email from O'Neil to plaintiff, asking plaintiff if it was okay that her permanent work station be moved to the back desk.  (ECF No. 90-2 at 1.)  O'Neil then states that, if plaintiff moved, she "would still be working with the walk-in applicants as back-up support and be working on phones and emails but you would no longer be alternating desks every other week."  (*Id*.)  This statement simply does not establish what plaintiff's work duties were or what plaintiff actually did in the office.  Moreover, the fact that plaintiff responded to O'Neil's email with, "[t]hat would be fine," does not mean that she agreed with the characterization of her work duties, given that the only question being asked of her was whether she was okay with the move of her work space.

[31] Plaintiff's objection to defendants' citation to O'Neil's affidavit in this regard does not respond to the factual statement presented.  (*See* ECF No. 91-1 at ¶ 109.)  Whether or not it was impossible for plaintiff to receive 278 calls per day has no bearing on the average length of time of plaintiff's telephone calls.  That being said, defendants' proposed factual statement does not accurately state that to which it cites.  (*See id*.)  Thus, the Court has provided precisely what the evidence states.

everyone in the office was aware of issues related to the Avaya telephone system.  (*Id.* at ¶ 62(AF).)

During May 2014, plaintiff was logged into the Avaya system for only nine days, starting May 12,

2014.  (*Id.* at ¶ 65(AF).)  Craighead received complaints about customers being disconnected and

long wait times every day from May 2014 until mid June 2014.  (*Id.* at ¶ 66(AF).)[32]  As of May 29,

2014, O'Neil did not believe that plaintiff was responsible for all of the disconnected telephone calls.

(ECF No. 85-10 at 261:4-16.)[33]

On June 3, 2014, plaintiff submitted a request for FMLA leave.  (ECF No. 91-1 at ¶ 111.)

O'Neil was not aware of this leave request.  (*Id.* at ¶ 112.)

On June 4, 2014, plaintiff was sitting at the back desk in the CDE reception area; a desk

which Grange had occupied prior to her retirement in May 2014.  (ECF No. 91-1 at ¶¶ 68-69(AF),

72 (AF).)  The telephone on the back desk had been assigned to Grange, and Grange had set up

voicemail on the telephone.  (*Id.* at ¶¶ 69(AF), 72 (AF).)  When Grange retired, CDE retained the

telephone's extension, but Grange's voicemail was discontinued.  (*Id.* at ¶ 72(AF).)  Each customer

service center employee had a personal telephone number associated with their telephone.  (*Id.* at

¶ 71(AF).)  The telephone on the back desk could receive calls through the Avaya system as well as

calls placed to the telephone number directly associated with the telephone.  If a telephone call did

---

[32] Although defendants argue that this fact is immaterial, the reason they give is purely argument, not a factual statement.

[33] In this factual statement, plaintiff states that she "was not responsible for the May 29 disconnects," citing a portion of O'Neil's transcript.  (ECF No. 91-1 at ¶ 67(AF).)  O'Neil's cited deposition testimony, however, states that O'Neil did not believe that plaintiff was responsible for all of the disconnected telephone calls, which is not the same thing as plaintiff implies in her factual statement.

not come through the Avaya system, an employee could identify the caller by looking at the caller ID.  (*Id*.)[34]

Klein believed that, if an employee was logged into Avaya and did not pick up a telephone call, the call would go to voicemail and, if voicemail was not set up, the caller would be disconnected. (ECF No. 91-1 at ¶ 74(AF).)  Klein did not share this information with plaintiff.  (*Id*. at ¶ 75(AF).)  Klein and plaintiff also did not have discussions about "the divert key."  (*Id*. at ¶ 76(AF).)  In June 2013, plaintiff was emailed a telephone guide, which stated, *inter alia*, that a telephone call could be diverted to voicemail by pressing "the iDivert soft key."  (ECF No. 90-5 at 1-3.)  Plaintiff believed that the divert button would push a telephone call to somebody else.  (ECF No. 85-34 at 44:4-10.)[35]  Employees were not trained on what the divert button did because O'Neil believed that under no circumstances should anyone have been using that button.  (ECF No. 90-1 at ¶ 8.)  O'Neil informed Craighead that, when the divert button was pressed and voicemail was not working or full, a telephone caller would be disconnected.  (*Id*. at ¶ 77(AF).)  O'Neil did not share this information with plaintiff.  (*Id*. at ¶ 78(AF).)

---

[34] It is disputed whether plaintiff was trained on the "phone system." (*See* ECF No. 91-1 at ¶ 70(AF).)  Indeed, plaintiff's own deposition testimony may be conflicting, given that, although she testified that she was not trained on the phone system, ECF No. 85-34 at 36:6, she also testified that she "knew exactly" what she was doing on the telephones, ECF No. 90-17 at 57:15-17.  It does, however, appear that *Klein* did not provide plaintiff with training on the Avaya system.  (ECF No. 85-24 at 137:10-23.)  On another note, defendants argue that most of plaintiff's factual statements related to the back desk and Grange's use of that desk before her retirement are irrelevant because the back desk had been assigned permanently to plaintiff and plaintiff was responsible for setting up her own voicemail.  (*See* ECF No. 91-1 at ¶¶ 68-69, 72-73 (AF).)  The emails to which defendants cite for these rebuttals, however, do not go quite as far as defendants contend, given that, respectively, the emails are not conclusive evidence that plaintiff was permanently assigned to the back desk or that, even if plaintiff was required to set up voicemail, she was required to do so on the back desk.  (*See* ECF No. 90-2 at 1; ECF No. 90-8 at 2.)

[35] In another factual statement, plaintiff appears to assert that by pressing the divert button she did in fact redirect telephone callers into the queue.  (*See* ECF No. 91-1 at ¶ 85(AF).)  However, at most, plaintiff's affidavit establishes that this is what plaintiff believed happened when she pressed the divert button, not that it actually happened.

O'Neil and Klein instructed plaintiff to watch the call center queue and only answer telephone calls if there were six or more callers in the queue. (ECF No. 85-34 at 29:5-14, 42:1-20.)[36] McGrew told plaintiff to keep "the Avaya system on in case you need to jump in, but hit the divert because it will go to someone else." (ECF No. 91-1 at ¶ 82(AF).)[37] McGrew told plaintiff to not answer telephone calls, but to divert them. (*Id*. at ¶ 83(AF).)[38]

On June 4, 2014, O'Neil watched a live security video of plaintiff, which showed her both logged in and logged out of the "Avaya" phone system. (ECF No. 91-1 at ¶ 113.)[39] Plaintiff was the

---

[36] In this factual statement, plaintiff asserts that McGrew also told her to only answer telephone calls if six or more callers were in the queue. (*See* ECF No. 91-1 at ¶ 80(AF).) However, the cited deposition transcript only mentions O'Neil and Klein as telling plaintiff to act in that manner. On the other hand, defendants dispute this factual statement. (*See id*.) With respect to O'Neil and Klein, defendants assert that the evidence is undisputed that O'Neil and Klein never told plaintiff to push the divert button, citing O'Neil's affidavit submitted with the motion for summary judgment. The cited portion of that affidavit, however, relates to the reasons why O'Neil gave plaintiff the March 14, 2014 corrective action. (*See* ECF No. 72-32 at ¶ 8.) Even if defendants meant to cite to the same paragraph of the affidavit O'Neil submitted with defendants' reply, that paragraph still does not address whether *Klein* told plaintiff to only answer telephone calls if six or more callers were in the queue. (*See* ECF No. 90-1 at ¶ 8.)

[37] In another factual statement, plaintiff attempts to set forth the title and job duties of McGrew. (*See* ECF No. 91-1 at ¶ 81(AF).) The exhibit to which plaintiff cites, however, does not contain the number of pages plaintiff appears to believe that it does, given that plaintiff cites to pages 6 and 7 of the exhibit and the exhibit actually contains just two pages. (*See* ECF No. 85-28.) As already stated, the Court is not in the business of remedying the parties' sloppy citation practices. On the other hand, defendants assert that facts related to McGrew are irrelevant because McGrew did not have supervisory authority over plaintiff. (ECF No. 91-1 at ¶¶ 81-82.) Defendants, though, cite no evidence to support this assertion, thus, the Court does not consider it as refuting plaintiff's factual statements.

[38] Defendants dispute this factual statement, but the evidence to which they cite does not actually dispute the specific factual statement. (*See* ECF No. 91-1 at ¶ 83(AF).)

[39] Defendants also assert that O'Neil watched the live video due to "unusual Avaya data and the increased number of complaints." (ECF No. 91-1 at ¶ 113.) First, the paragraph of O'Neil's affidavit to which defendants cite does not state that O'Neil watched the live video for these reasons. (*See* ECF No. 72-32 at ¶ 23.) Second, in earlier factual statements, defendants assert that the number of complaints about "the phones" increased from 1-2 a month to 33 in May 2014, and O'Neil discovered that plaintiff was not following established protocols for taking telephone calls after "pull[ing] data from the Avaya phone system." (*See id*. at ¶¶ 107-108.) Plaintiff disputes both of these proposed factual statements. (*See id*.) The Court agrees that a dispute exists as to these facts. Although defendants assert that O'Neil could "track" the documented complaints, and observed Avaya data, defendants do not submit any such data with the motion. Thus, given plaintiff's statements in her affidavit contesting defendants' assertions, statements

21

only customer service representative O'Neil was watching.  (*Id*. at ¶ 87(AF).)  The video shows the following:[40] a person (presumably plaintiff) sitting at a desk; on numerous occasions, a red light on the telephone and an orange light on the telephone's console light up (presumably this means the telephone is ringing); the individual then either presses a button on the console, causing the lights to turn off, or leaves the telephone alone until the lights turn off (presumably this ends the call); on two occasions, when the lights are on, the individual picks up the telephone very slightly and then immediately puts the telephone back down, which turns the lights off.  (*See* ECF No. 72-47.)

O'Neil also recorded an audio video of plaintiff on June 4, 2014.  (*Id*. at ¶ 88(AF).)  The audio recording is the telephone message O'Neil heard immediately after plaintiff hit the divert button.  (*Id*.)[41]

Klein believed that call center representatives logging into the Avaya system did so by picking up the telephone and immediately hanging up.  (ECF No. 91-1 at ¶ 97(AF).)  The same procedure applies for logging out.  (*Id*. at ¶ 98(AF).)[42]  Craighead would also pick up the telephone's

---

that defendants do not challenge for purposes of the motion, the Court considers facts about the increase in complaints and plaintiff's observance of established protocols as disputed.

[40] An edited version of the video has been submitted, and the Court has reviewed it.  The following description is the Court's summary of events depicted.  There is no audio in the video submitted.  On another note, plaintiff asserts that video existed of events prior to 12 o'clock, but it was "overwritten" and not turned over.  (ECF No. 91-1 at ¶ 109(AF).)  Plaintiff cites page 279 of exhibit 9 for this statement, but exhibit 9 does not contain a page 279.  (*See generally* ECF No. 85-10.)

[41] The Court has not been provided with a copy of the audio recording.  Instead, plaintiff cites to a purported transcript of the recording.  (*See* ECF No. 85-35.)  As discussed in more detail *infra*, to the extent the cited exhibit is an accurate transcript of the audio recording, the Court cannot discern anything intelligible from it, and plaintiff makes no adequate attempt to place the alleged audio into context so that the transcript can be understood.

[42] In another factual statement, plaintiff asserts that Klein could tell on one occasion after watching the video that plaintiff was not receiving an incoming telephone call because a light on the telephone would have blinked.  (ECF No. 91-1 at ¶ 99(AF).)  However, the cited deposition testimony does not support such a statement.  (*See* ECF No. 85-24 at 97:15-98:3.)  On the other hand, defendants dispute this and other

receiver and hang it up without speaking when she was logging in and out of the Avaya system. (*Id.* at ¶ 100(AF).) When plaintiff logged in or out of the Avaya system she would pick up the telephone and hang it up as part of that process. (*Id.* at ¶ 102(AF).) At times, because plaintiff was having problems with the Avaya system, she would pick up the telephone's receiver and listen in an attempt to determine what had caused the problem and whether she was actually connected. (*Id.* at ¶ 103(AF).)[43] Klein could not recall if she told plaintiff that she was logging in or out of the Avaya system incorrectly. (*Id.* at ¶ 104(AF).)

Bacca prepared a written summary for O'Neil of the video surveillance. (*Id.* at ¶ 106(AF).) In the summary, Bacca wrote that plaintiff hanged up on a customer at 12:13:06, but Bacca testified that, at that time, he did not see a red and yellow light come on, which for all other telephone calls he had seen. (ECF No. 85-31 at 76:11-19.)

After being repeatedly called on the telephone, plaintiff went to O'Neil and asked her why she kept calling plaintiff. (ECF No. 91-1 at ¶ 108(AF).) O'Neil replied that it was because plaintiff was hanging up on customers, and then told plaintiff that she was being put on administrative leave. (*Id.*) O'Neil told Hawley that plaintiff was seen on video repeatedly failing to answer the telephone, which O'Neil said resulted in disconnected callers. (ECF No. 72-25 at ¶ 11.)[44] Hawley believed that

---

similar factual statements as immaterial. (*See, e.g.*, ECF No. 91-1 at ¶¶ 97-100.) However, the reason defendants give for why the factual statements are immaterial does not show the same, given that plaintiff's factual statements are attempting to explain why she is not answering the telephone.

[43] In another factual statement (ECF No. 91-1 at ¶ 101(AF)), plaintiff cites deposition testimony from Bacca that appears to describe the video of June 4, 2014 as showing "that most people just pick [the telephone] up and hang it up." (*See* ECF No. 85-31 at 46:21-22.) Bacca further testified that "[t]here were times when [plaintiff] would pick it up, and I don't know why, but she would pick it up and stay on there." (*Id.* at 46:22-24.) It is unclear, though, whether Bacca is talking about the video submitted with the motion for summary judgment, given that Bacca talks of "most people" picking up and then hanging up a telephone, while the video only shows one person—plaintiff.

[44] Plaintiff disputes that she, in fact, disconnected any callers. (ECF No. 91-1 at ¶ 115.)

such conduct was "so egregious" that she placed plaintiff on administrative leave on June 4, 2014. (*Id*. at ¶ 12; ECF No. 91-1 at ¶ 115.)[45]

Pursuant to Board Rule 4-28(C)(8), employees with unsatisfactory performance indicating an inability to perform in an area directly related to the job could be removed from consideration for relevant vacancies. (ECF No. 91-1 at ¶ 110(AF).)  Under Board Rule 6-2, an employer also has the option to terminate employment when an act is so flagrant or serious that immediate discipline is proper. (*Id*.)[46]

An investigation revealed that there were no technical problems with the Avaya system or plaintiff's work station, but CDE did not investigate plaintiff's complaint of a computer problem. (*Id*. at ¶ 117.)  Plaintiff had complained to Klein on June 4, 2014 that she was having problems with the Avaya system not allowing her to log in and out. (*Id*. at ¶¶ 91, 93(AF).)  Plaintiff had complained to Klein about similar problems previously. (*Id*. at ¶ 92(AF).)  Klein attributed plaintiff's computer problems to "user error," in that plaintiff would lock herself out of the computer's password, rather than a problem with the computer itself. (ECF No. 72-11 at ¶¶ 23, 25.)

On June 17, 2014, CDE approved plaintiff's June 3, 2014 request for FMLA leave. (*Id*. at ¶ 119.)

---

[45] Defendants assert that plaintiff was also placed on administrative leave because of other performance issues. (ECF No. 91-1 at ¶ 115.)  The paragraph of the cited affidavit, though, does not support that plaintiff was placed on administrative leave due to "other performance issues." (*See* ECF No. 72-25 at ¶¶ 11-12.)

[46] In another factual statement, plaintiff asserts that she worked for CDE for over 27 years, and she was aware that CDE had a "progressive discipline policy," citing her affidavit. (ECF No. 91-1 at ¶ 111(AF).)  The paragraph of her affidavit to which plaintiff cites, however, does not support this factual statement.  That paragraph pertains to Board Rule 4-28(C)(8). (*See* ECF No. 85-2 at ¶ 72.)

On July 25, 2014, Hawley sent plaintiff a letter terminating her employment as of July 31, 2014. (*Id*. at ¶ 121.)[47] O'Neil recommended to Hawley that plaintiff's employment be terminated. (ECF No. 72-32 at ¶ 29.) Klein, plaintiff's direct supervisor, supported the decision to terminate her employment due to plaintiff's poor work performance and the events of June 4, 2014.[48] (ECF No. 91-1 at ¶ 123.) If the events of June 4, 2014 had not taken place, Hawley did not believe that plaintiff would have been fired, and that plaintiff was "moving forward with her performance evaluation, she had a corrective action, but she had specific activities, we were actually a few weeks from having her check in on those activities, and the hope was that she could meet those activities." (ECF No. 85-39 at 124:21-125:9.)[49]

## III.    Discussion

### A.    Plaintiff's Title VII Claims

#### 1.    Religious Discrimination

Title VII makes it unlawful to discharge or otherwise discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment due to the individual's

---

[47] Defendants assert that plaintiff was terminated in order to preserve office integrity and to provide adequate customer service. (ECF No. 91-1 at ¶ 120.) The exhibits to which they cite, however, do not support such a statement. (*See* ECF No. 72-25 at ¶ 14-15; ECF No. 72-32 at ¶ 29.) Rather, that is counsel's gloss on the cited evidence. Defendants also assert that other employees were burdened with plaintiff's poor performance, and customers had longer wait times. (ECF No. 91-1 at ¶ 118.) Again, the cited evidence does not support this statement. The cited evidence, instead, is couched in general terms, and does not blame the alleged problems on plaintiff specifically. (*See* ECF No. 72-32 at ¶ 25.)

[48] Plaintiff objects to this factual statement (ECF No. 91-1 at ¶ 123), however, the conclusory statement in her affidavit—that her employment was terminated due to discrimination and retaliation (*see* ECF No. 85-2 at ¶ 64)—does not refute the specific statement in Klein's affidavit that Klein supported plaintiff's termination due to past work performance and the events of June 4, 2014 (*see* ECF No. 72-11 at ¶ 50.)

[49] The Court finds defendants' remaining factual statements to be immaterial (ECF No. 91-1 at ¶¶ 124-126), argument of counsel (*id*. at ¶¶ 127-128), or disputed (*id*. at ¶ 129). The Court also finds plaintiff's final factual statements to not be pertinent (*id*. at ¶¶ 113-115) or not properly stated (*id*. at ¶ 116).

religion. 42 U.S.C. § 2000e-2(a)(1). At summary judgment, the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973), burden shifting framework is used. *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 (10th Cir. 2000). In the first phase, plaintiff must show: (1) she was subjected to some adverse employment action; (2) at the time of the employment action, the employee's job performance was satisfactory; and (3) some additional evidence to support the inference that the employment action(s) were taken because of a discriminatory motive based upon the employee's failure to hold or follow her employer's religious beliefs. *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 978-979 (10th Cir. 2008). If plaintiff makes such showings, the burden shifts to defendants to articulate a legitimate nondiscriminatory reason for the employment decision. *Id.* at 979. Then, if defendants articulate a legitimate reason for the employment decision, the burden shifts back to plaintiff to show that defendants' proffered reasons were a pretext for discrimination. *Id.*

In her response to the motion for summary judgment, plaintiff asserts that she relies upon two adverse employment actions: (1) reassignment to the call center, and (2) assigning her duties in excess of her medical restrictions for "almost five months in 2013." (ECF No. 85 at 4.) The Court agrees with the latter, but not the former. With respect to the former, the sum total of plaintiff's purported evidence is her personal belief that her work prior to being reassigned held more "prestige." (*See id.* at 6-7.) Unlike the case to which plaintiff cites, *Piercy v. Maketa*, 480 F.3d 1192, 1205 (10th Cir. 2007), which, in dicta, the Circuit stated that it was not convinced a transfer was truly lateral, here, plaintiff has pointed to no actual evidence that being reassigned resulted in her performing more arduous and stressful work or obtaining lesser job flexibility. Notably, plaintiff's assertion that there were no opportunities for "professional growth" in the call center is

entirely unsupported, and the paragraphs of her response statement of facts to which she cites do not have any bearing on the tedium or desirability of working in the call center. (*See id* at 7 (citing ECF No. 85-1 at ¶¶ 33-34)).[50]

With respect to the latter employment action—duties in excess of plaintiff's medical restrictions—this appears to be clearly adverse to plaintiff. Although the evidence is not perfectly clear, construing it in plaintiff's favor, it appears that plaintiff was assigned and worked shifts on the telephone in significant excess of her medical restrictions of two-three hours per day in non-consecutive hours, at least with respect to four of the five work days. (*See* ECF No. 72-16 at 25; ECF No. 85-14 at 2-6.) Moreover, plaintiff has stated that she was "emotionally and physically traumatized" by CDE's actions in scheduling her on the telephone in excess of her medical restrictions, and this "aggravated" her surgery site. (*See* ECF No. 85-2 at ¶ 32.) In addition, defendants do not contest in their reply the issue that plaintiff's purported telephone schedule constituted an adverse employment action. (*See* ECF No. 90 at 2-3.) As such, the Court finds scheduling plaintiff to work in excess of her work restrictions to be an adverse employment action.

The next part of plaintiff's initial burden is to show that she was satisfactorily performing her job at the time of the adverse employment action; here, the months between June and December 2013 when the telephone schedule was allegedly in effect. Again, the issue is not necessarily conclusive, but construing the evidence in plaintiff's favor, she received favorable performance reviews from 2010 through March 2013. (*See* ECF No. 91-1 at ¶ 6.) More specifically, Lawanson rated plaintiff as "Fully Competent" in her November 2011 to March 2012 performance

---

[50] In light of the lack of evidence presented by plaintiff, reassigning her to the call center also does not constitute an adverse employment action for purposes of her Title VII retaliation claim. *See Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71, 126 S.Ct. 2405 (2006) (explaining that the jury had "considerable evidence" before it that job duties were more arduous and that a job was objectively considered better).

rating (*id.* at ¶ 3(AF)), and plaintiff received an overall rating of "Meets Expectations" for her performance from April 2012 to March 2013 (ECF No. 85-5 at 7-8). Plaintiff did not receive a demonstrably negative performance review until May 2014, when she received her April 2013 to March 2014 performance review, with an overall rating of "Needs Development." (*See* ECF No. 72-44 at 10.) As a result, the Court finds that plaintiff was satisfactorily performing her job at the time her telephone schedule allegedly exceeded her medical restriction.

The final part of plaintiff's initial burden is to provide some additional evidence to support the inference that the employment action was taken because of a discriminatory motive based upon the employee's failure to hold or follow her employer's religious beliefs. *See Fischer*, 525 F.3d at 978-979. On this part, plaintiff fails for the simple reason that all of the arguments in her response relate to Lawanson, an employee of CDE, not her employer CDE itself. For example, plaintiff argues that Lawanson expressed her dissatisfaction with plaintiff's decision to stop attending church, that Lawanson called plaintiff a hypocrite, and that Lawanson displayed her vindictiveness towards plaintiff in claiming that a customer complaint was about plaintiff. (ECF No. 85 at 13-14.) Equally problematic, plaintiff asserts that Lawanson expressed *her* desire to retaliate against plaintiff for not participating in Bible studies. (*See id.* at 14.) The one theme to all of these allegations is Lawanson, not plaintiff's employer. Plaintiff has provided no evidence (or argument) of what her employer's religious beliefs were, and thus, she can hardly be said to have shown that her employer discriminated against her due to her failure to follow any such belief. *See Fischer*, 525 F.3d at 978-979.

Accordingly, defendants are entitled to summary judgment with respect to plaintiff's Title VII religious discrimination claims.

## 2.    Hostile Work Environment

To establish her hostile work environment claim for purposes of summary judgment, plaintiff must succeed through three steps. *See Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1139 (10th Cir. 2008) (involving a racially hostile work environment).  First, plaintiff must show that the alleged acts are part of the same hostile work environment, which requires looking at the type of acts, their frequency, and the perpetrator.  Second, plaintiff must show that "a reasonable jury could conclude that the harassment was pervasive or severe enough to alter the terms, conditions, or privileges of employment." *Id*. (quotation omitted).  Third, plaintiff must present "evidence sufficient to give rise to a reasonable inference that [her employer's] response to the incidents of which it was apprised was inadequate." *Id*.  In addition, the harassment must stem from a discriminatory animus.  *See id*. (explaining that "[t]he harassment must be racial or stem from racial animus.") (quotation and alteration omitted).

Here, plaintiff has failed to meet one or more of the above steps with respect to the acts she relies upon.  As an initial matter, plaintiff cites a description of the environment from a co-worker. (ECF No. 85 at 37.)  In doing so, plaintiff does not cite to any statement of fact presented in the various pleadings filed with the Court; instead, she cites straight to an exhibit.  (*Id*.)  In other words, the alleged description of the work environment has not been subject to the Court's process for presentation and response to factual statements, nor has it been included in the Court's background of the facts *supra*.  As a result, the Court will not consider the co-worker's alleged summary of plaintiff's work environment.  The Court further notes that all of the remaining alleged acts are relied upon without citation to the record.  (*See id*. at 36-38.)  Thus, really, the Court should not consider those alleged acts either.

In any event, the co-worker's summary, and many of plaintiff's other proposed acts, again, relate to Lawanson.  An employer, though, is not automatically liable for an employee's conduct. *Tademy*, 614 F.3d at 1139.  And here, the properly presented evidence shows that, when told of Lawanson's Bible studies, Lawanson's superiors told her to stop those activities.  (ECF No. 91-1 at ¶¶ 39, 44-45.)  Moreover, after plaintiff told Hawley that she was being treated unfairly because she had complained about Lawanson's Bible studies, Hawley gave plaintiff a new supervisor.  (ECF No. 91-1 at ¶¶ 51-52, 54.)  As a result, plaintiff has failed to show that CDE responded inadequately to Lawanson's acts.

Plaintiff also asserts that CDE failed to investigate her complaints for over a year, and this "unquestionably altered her work environment" by allowing the conduct to "fester."  (*Id.* at 37.) Plaintiff, though, fails to explain how her work environment was altered, what conduct was allowed to fester, or how any of this was related to a discriminatory animus.  Notably, even for those acts properly presented, such as the five month delay in correcting plaintiff's work schedule so that it fit within her medical restrictions, discussion of discriminatory animus is absent from plaintiff's arguments.  (*See id*. at 36-38.)  And, as the Court found *supra*, there is no evidence in the record that creating the work schedule or the delay in fixing it was the result of a discriminatory animus on the part of plaintiff's employer.

Finally, the Court notes that plaintiff relies on precisely zero cases to support her assertion that it is "well within the realms of reason and law" to say that CDE's conduct was sufficiently severe or pervasive to alter the terms, conditions, or privileges of her employment.  (*See id.*)  The Court believes that this lack of support for plaintiff's claim speaks volumes for its deficiencies.

30

Accordingly, the Court finds that defendants are entitled to summary judgment with respect to plaintiff's Title VII hostile work environment claim.

### 3.      Retaliation

In order to establish a prima facie case of retaliation, plaintiff must show that (1) she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action. *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008). Here, defendants do not challenge the first question (*see* ECF No. 72 at 11-17), so the Court proceeds straight to the latter two.

For the second, "'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id*. (quoting *Burlington Northern*, 548 U.S. at 68) (internal quotation omitted). This is an objective test, "asking how a reasonable employee would have interpreted or responded to the action." *Id*. at 1213.

As already explained, plaintiff's reassignment to the call center is not an adverse employment action, while the violation of her medical restrictions is one. For purposes of her retaliation claim, plaintiff also relies upon various warnings, corrective actions, and performance evaluations, her termination, and CDE purportedly "reneging on [a] settlement agreement." (ECF No. 85 at 15.) The Court will spend little time on the last alleged action. For the reasons discussed in more detail *infra* with respect to plaintiff's separate claim that defendants breached the purported settlement agreement, plaintiff has failed to present any evidence that such an agreement existed, and thus, the Court does not find reneging on a non-existent agreement to be an adverse employment action. The

Court also spends little time on plaintiff's termination at this part of the analysis because defendants concede that the same was an adverse employment action.  (ECF No. 72 at 12.)  The Court instead focuses on the various warnings, corrective actions, and performance evaluations that plaintiff received.

Defendants' arguments in this regard are that these actions are not adverse because, despite them, plaintiff continued to make complaints of discrimination and they did not effect her conditions of employment.  (*See id*.)  In light of *Burlington Northern*, the latter argument is certainly irrelevant.  *See Somoza*, 513 F.3d at 1213.  As for the former, in *Somoza* the Tenth Circuit Court of Appeals explained that "the fact that an employee continues to be undeterred in his or her pursuit of a remedy, as here was the case, *may shed light* as to whether the actions are sufficiently material and adverse to be actionable."  *Id*. at 1214 (emphasis added).  Defendants, though, make no effort how plaintiff continuing to complain sheds light on whether giving her warnings, negative performance evaluations, and corrective actions was sufficiently material and adverse to be actionable.  (*See* ECF No. 72 at 12; ECF No. 90 at 8.)  Moreover, the only precedential Tenth Circuit case to which defendants cite in their reply (ECF No. 90 at 7) does not stand for the proposition they contend.  *See Daniels v. United Parcel Serv.*, 701 F.3d 620, 638-639 (10th Cir. 2012) (explaining that, "even if the district court applied the wrong standard," in finding that warnings had no effect on an employee's salary or benefits, the defendant articulated a legitimate nondiscriminatory motive for the warnings and the employee failed to show pretext).[51]

---

[51] To the extent an unpublished Tenth Circuit case to which defendants cite, *Kenfield v. Colo. Dep't of Pub. Health & Env't*, 557 F. App'x 728, 734 (10th Cir. 2014), can be interpreted as meaning that, if an employment action fails to subjectively deter an employee from continuing to complain, the action is not sufficiently adverse, the Court disagrees.

Here, although the record is clear that plaintiff continued to complain about alleged discrimination and retaliation, and complain repeatedly, the only light the Court can see cast by this is that plaintiff was persistent in wishing to have remedied her complaints.  An employee should not be placed between a rock and a hard place in having to choose between complaining about alleged discrimination while losing the ability to later bring a retaliation claim, or keeping quiet in the face of discrimination so that she may preserve her legal entitlements.  That is not a choice *Burlington Northern* requires an employee to make, given that its test is focused upon a reasonable employee's reaction to discrimination.  Here, the record shows that plaintiff received a written warning, a negative performance evaluation for April 2013 to March 2014, and corrective actions pertaining to falsifying time sheets, not correctly using the "Avaya" phone system, and customer service deficiencies.  Further, there is no evidence that these events did not remain in plaintiff's employee record.  In addition, pursuant to Board Rule 4-28(C)(8), employees with unsatisfactory performance indicating an inability to perform in an area directly related to the job could be removed from consideration for relevant vacancies.  In light of this rule, the Court finds that the written warning, 2013 to 2014 performance evaluation, and corrective actions constituted adverse employment actions for purposes of plaintiff's retaliation claim.

This leaves the third question: whether a causal connection existed between the protected activity and the materially adverse actions.  Although a plaintiff is required to show "but for" causation, *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. ___, 133 S.Ct. 2517, 2534 (2013), for purposes of a plaintiff's prima facie case, a causal connection can be established by temporal proximity alone, *see Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1191 (10th Cir. 2016) (explaining that *Nassar* did not alter the Tenth Circuit's precedent "holding that an ADA

retaliation plaintiff may rely solely on temporal proximity to show causation"). Temporal proximity means that protected conduct was closely followed by adverse action. *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008). A lapse of three months or more, however, requires a plaintiff to provide additional evidence beyond temporal proximity to establish causation. *Foster*, 830 F.3d at 1191. Here, plaintiff has met her prima facie burden. As already mentioned, defendants do not challenge the numerous instances of protected activity upon which plaintiff relies. To be clear, plaintiff relies upon 19 instances of protected activity, spanning from April 1, 2013 to May 25, 2014. (ECF No. 85 at 14-15.) The adverse employment actions highlighted *supra* fit in close temporal proximity to many of these instances of protected activity.

Specifically, although the record is not entirely clear, construing it in plaintiff's favor, it appears that the final email, setting her telephone schedule in violation of her medical restrictions, was sent on June 12, 2013. (ECF No. 85-14 at 2-6.) This was seven days from protected activity on June 5, 2013 (*see* ECF No. 91-1 at ¶ 19(AF)), and just two days from a further activity (*see id.* at ¶ 21(AF)). Next, the written warning (initially made a corrective action) was given on August 1, 2013. (*Id.* at ¶¶ 55-57.) As well as the above activities, plaintiff also relies upon ones on July 11 and 15, 2013. (*See id.* at ¶¶ 25(AF), 51-52.) The April 2013 to March 2014 performance review was delivered on April 27, 2014, the same date that plaintiff received a corrective action. (ECF No. 91-1 at ¶ 99; ECF No. 72-45 at 12.) Plaintiff relies upon protected activity on March 21 and April 6, 2014 for these events. (*See* ECF No. 85-2 at ¶ 53; ECF No. 85-28 at 2-3.)

One of the corrective actions, though, the one occurring on March 14, 2014, is on less firm footing. The protected activity closest to this event purportedly took place on March 5, 2014, when plaintiff refused to release the claims she had filed with the EEOC and CDE reneged on the

34

settlement agreement.  However, as noted *supra*, and discussed in more detail *infra*, plaintiff has presented no evidence that a settlement took place.  Moreover, plaintiff has failed to provide any support for the contention that engaging in settlement negotiations, with or without an agreement, is a protected activity.  (*See* ECF No. 85 at 18-19.)  However, at this juncture, because refusing to settle claims of discrimination may arguably be a protected activity, and because defendants do not raise this issue (*see* ECF No. 90 at 10-11),[52] the Court finds that plaintiff has shown a sufficient temporal proximity between her negotiation stance and the March 2014 corrective action.

Plaintiff's termination is also not on the surest footing.  Plaintiff was terminated on July 25, 2014.  (ECF No. 91-1 at ¶ 121.)  The protected activities upon which plaintiff relies allegedly took place on four different days in May 2014.  (ECF No. 85 at 15.)  The first activity, plaintiff did not actually engage in; rather the factual statement to which plaintiff cites pertains to O'Neil becoming aware of a State investigation.  (*See* ECF No. 91-1 at ¶ 57(AF).)  Plaintiff also relies upon two conclusory arguments presented in her additional factual statements; neither of which present facts.  (*See id*. at ¶¶ 58, 64(AF).)  The remaining activity involved plaintiff being interviewed by an investigator with respect to her retaliation and harassment claims.  (*Id*. at ¶ 59(AF).)  However, plaintiff fails to present any evidence that defendants were aware of this activity or what she said to the investigator.  (*See id*.)  Nonetheless, although plaintiff was terminated on July 25, 2014, she was placed on administrative leave on June 4, 2014.  (ECF No. 91-1 at ¶ 115.)  With respect to this action, plaintiff relies on various activities, including her telling CDE, on April 6, 2014, that she

---

[52] Instead, defendants argue that the majority of plaintiff's protected activities occurred after CDE's employment actions.  (ECF No. 90 at 10-11; ECF No. 72 at 13-14.)  If the record is viewed through defendants' eyes only, that may be one way to consider the timeline of events, but that is not the Court's role at this stage of proceedings.  On the present record, plaintiff has sufficiently shown that her protected activities occurred *before* defendants' employment actions.

would continue a grievance.  (*See* ECF No. 85-28 at 2-3.)  Therefore, the Court finds that placing plaintiff on administrative leave was causally connected to protected activity.

Having met her initial burden, it now turns to defendants to present a legitimate nondiscriminatory reason for each of the adverse employment actions.  *Fye*, 516 F.3d at 1228.  This "is a burden of production and can involve no credibility assessment." *Id*. (quotation omitted).  As an initial matter, the Court cannot discern any attempt on defendants' part to justify the reason why plaintiff was purportedly given a telephone schedule that violated her work restrictions.  (*See* ECF No. 72 at 16-17; ECF No. 90 at 8-9.)  Therefore, for purposes of the motion for summary judgment, CDE has failed to meet its burden of production, and the Court finds that CDE is not entitled to summary judgment with respect to plaintiff's retaliation claim premised upon the violation of her work restrictions.  As for the remaining employment actions, plaintiff does not dispute that defendants have articulated legitimate nondiscriminatory reasons for those actions.  (ECF No. 85 at 20.)

Therefore, with respect to them, the Court moves to the final part of the burden shifting framework: pretext, which requires plaintiff to "produce evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Fye*, 516 F.3d at 1228.  "The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 924-925 (10th Cir. 2004).  Plaintiff can show pretext, though, "by persuading the jury that the evidence of [her] misconduct presented

to [the decisionmaker] was so implausible, incoherent, or internally contradictory that [the decisionmaker] must have made [his or her] decision on some other basis." *Id*. at 925.

With respect to the written warning (initially a corrective action) in August 2013 for plaintiff allegedly not securing confidential information, plaintiff argues that CDE withdrew the initial corrective action because it was issued "in error," and no finding was made that plaintiff failed to secure confidential information. (ECF No. 85 at 24.) Defendants argue that, from Hawley's perspective, plaintiff's conduct warranted a written warning. (ECF No. 90 at 8.) The Court agrees with plaintiff that summary judgment is not warranted as to this employment action.

As an initial matter, defendants fail to cite to any factual statement supporting their position. (*See id*.) Based upon the Court's summary of the facts *supra*, the evidence fails to show that Hawley concluded plaintiff left out confidential information as defendants contend. Notably, the exhibit to which defendants cite in their factual statements does not support the same. The exhibit—a short email from Hawley to plaintiff states simply that Hawley agreed a corrective action was issued in error and would be withdrawn, but "because of the importance of securing sensitive information, you [plaintiff] are receiving the written warning attached to this email." (ECF No. 72-26 at 4.) As for the written warning, it states only that "[t]here has been at least one instance when applicant's personal information, including social security numbers was visible in the trash container next to your desk." (*Id*. at 5.) Nowhere is there a finding that *plaintiff* put the confidential information in her trash container; merely that the information was there.[53] As such, the Court finds the reasons,

---

[53] This is especially so here where the written warning does not address any of plaintiff's assertions, in response to the original corrective action, that she secured all information in compliance with office procedures, and she did not know what happened to the information after she left for the day. (*See* ECF No. 72-26 at 2-3.)

which, on the current record, are poorly fleshed out, for issuing the written warning to be so incoherent that the decision to issue the written warning must have been made on some other basis.

Next, the request for action, corrective actions, and performance review in March and April 2014. On this front, the Court finds that plaintiff has failed to show any contradictions or implausibilities in defendants' actions. With respect to the request for action and corrective action in March 2014, plaintiff asserts that she called in as instructed by her supervisor each time she was late or absent, however, plaintiff fails to cite to anything, evidence or factual statements. (*See* ECF No. 85 at 24.) Moreover, although plaintiff asserts that evidence is disputed about whether she deserved the actions, it is undisputed that O'Neil believed that the same were necessary after several months of trying to get plaintiff to improve her performance to no avail. (*See* ECF No. 72-32 at ¶ 14.) The same is true of whether or not plaintiff falsified her timesheets; it is O'Neil's belief in issuing the corrective action that matters. In addition, with respect to the March 2014 corrective action, plaintiff ignores the fact that O'Neil took into account that plaintiff worked through her lunch and breaks. (*See* ECF No. 72-38 at 1.) Moreover, the factual statement to which plaintiff cites to support her contention, that signing into a computer did not accurately reflect time actually worked, does not actually support that contention. (*See* ECF No. 85 at 25 (citing ECF No. 91-1 at ¶ 50(AF).))

Plaintiff further asserts that a co-worker was solicited to obtain information on plaintiff. How or why the co-worker obtained the information, though, is of no import, especially where, as here, plaintiff does not dispute the underlying errors in her work. (*See* ECF No. 85 at 24.) With respect to another aspect of the March 2014 corrective action—plaintiff's alleged failure to log in and out of the Avaya telephone system properly—plaintiff fails to explain, even if she never received any training to improve her performance, how this rendered the corrective action incoherent or

38

implausible.  Plaintiff's reliance on Klein's testimony is also misplaced.  Klein did not testify that she had no problems with plaintiff's use of the system (*see id*. at 25), rather, she testified that she did not track whether employees logged in or out of the Avaya system.  (*See* ECF No. 85-24 at 127:14-25.)  In addition, as noted *supra*, plaintiff has not properly presented evidence that Klein did not recommend the March 2014 corrective action.  (*See* ECF No. 91-1 at ¶ 53(AF) (citing ECF No. 85-24 at 128-137).  In any event, it was O'Neil who gave plaintiff the corrective action, and there is no assertion that Klein disagreed with the same.

Finally, the only argument that plaintiff appears to make with respect to the April 2014 corrective action, concerning plaintiff's allegedly poor customer service, and the April 2013 to March 2014 performance review is that they were based upon "subjective criteria," which allowed supervisors to create their own standards in evaluating employees and created the "potential" to use prohibited factors.  (ECF No. 85 at 25-26.)  At best, this is rank speculation, given that plaintiff presents no evidence of any such prohibited evaluations or of using subjective criteria.  Plaintiff also ignores that the form of the April 2012 to March 2013 and the April 2013 to March 2014 performance reviews are substantially identical.  (*Compare* ECF No. 85-4, *with* ECF No. 72-44.)  Moreover, even if plaintiff was moderately accurate, she fails to tie this argument to the underlying issue: whether the reasons for her supervisors' actions were implausible or contradictory.

This leaves placing plaintiff on administrative leave for the events on June 4, 2014.  To begin, although it is disputed whether plaintiff actually disconnected callers on that day, it appears clear that O'Neil told Hawley that plaintiff was seen on video repeatedly failing to answer the telephone, which O'Neil said resulted in disconnected callers.  (*See* ECF No. 72-25 at ¶ 11.)  Thus, the important question is whether the evidence presented to Hawley was so implausible, incoherent,

or internally contradictory that Hawley's decision must have been made on some other basis. *Rivera*, 365 F.3d at 925. This is a close question on the present record. The parties agree on very little that happened on June 4, 2014, however, the Court finds that plaintiff has failed to sufficiently show that a jury could find the evidence upon which Hawley relied was so implausible and contradictory that her decision was made on some other basis. *See id.*

As an initial matter, it is important to note that very little evidence was presented to Hawley before she made her decision to place plaintiff on administrative leave. The extent of the evidence was O'Neil telling Hawley what O'Neil believed she had seen on the video. (*See* ECF No. 72-25 at ¶¶ 11-12.) Putting that aside, what does the video show? The Court's summary is outlined *supra*. It certainly shows lights turning on what is apparently plaintiff's telephone, plaintiff pressing a button on her telephone's console, ignoring the telephone, or lifting the receiver up and then down, and the lights turning off. Beyond this, the Court cannot definitively say anymore. Did the lights turning off mean that the caller was disconnected? Defendants certainly believe so. This then begs the question, was this belief implausible?

Plaintiff attempts to answer that question by making various arguments. In no particular order, first, plaintiff asserts that she did not disconnect callers. However, that is premised upon nothing other than statements in plaintiff's affidavit. (*See* ECF No. 91-1 at ¶ 115.) Second, plaintiff asserts that CDE had experienced months of problems with callers being disconnected; not all of which were caused by her. (*See* ECF No. 85-10 at 261:4-16.) That may be so, but it still does not explain away whether plaintiff caused *none* of the reported disconnected calls. It also does not address who was responsible (if anyone) for the alleged disconnected calls on *June 4, 2014*. The same is true of plaintiff assertion that CDE continued to suffer from customer complaints after June

4, 2014. (*See* ECF No. 85 at 36.)  Third, plaintiff argues that she was never trained on the telephone system (ECF No. 91-1 at ¶ 70(AF)), however, this is undermined by plaintiff's own deposition testimony that she knew *exactly* what she was doing on the telephones (*see* ECF No. 90-17 at 57:15-17).  Fourth, plaintiff argues that, when logging in and out of the Avaya system, a person will pick up and immediately hang up the telephone. (ECF No. 91-1 at ¶¶ 97-98(AF).)  However, at no point does plaintiff allege that this is what she was doing on June 4, 2014, when she picked up the receiver and then immediately put it back down.  (*See id*.)  Moreover, it does not explain the telephone calls that plaintiff ignored or for which she pushed a button on her console.

The most convincing evidence that plaintiff presents is two-fold.  First, plaintiff argues that Klein and O'Neil told her to only answer calls if there were six or more in the queue. (ECF No. 91-1 at ¶ 80(AF).)  This is hotly disputed by defendants, but, as already noted, the evidence to which they cite does not pertain to or refute this specific issue.  Plaintiff further asserts that she was told to press the divert button unless she was needed to jump into the telephone queue. (*Id*. at ¶ 82-83(AF).)  Again, as already noted, defendants fail to properly dispute this statement.  This evidence leaves open the possibility that, on June 4, 2014, plaintiff pressed the button on her console because she was told to.  There is still a problem with this though.  According to defendants, and a guide that was emailed to plaintiff, pressing the divert button caused telephone calls to be routed to voicemail. (*See* ECF No. 90-5 at 1-3.)  And, when voicemail was not set up, this resulted in callers being disconnected. (*See* ECF No. 91-1 at ¶¶ 74(AF), 77(AF).)  Although plaintiff asserts that Klein and O'Neil never told her this piece of information (*id*. at ¶¶ 75(AF), 78(AF)), she does not claim that she was not aware of it at all.  In any event, left open is why voicemail was not set up on plaintiff's telephone.  Although plaintiff attempts to obfuscate the issue by asserting that the telephone used

to be Grange's (*see id* at ¶¶ 69(AF), 72(AF)), the point is that Grange had retired and plaintiff was now using it, at least on June 4, 2014.  Plaintiff entirely fails to explain why she had not set up voicemail on the telephone at which she was working.

Plaintiff's second piece of potentially convincing evidence attempts to get around these problems.  Plaintiff points to a second audio recording of the events on June 4, 2014.  (ECF No. 91-1 at ¶¶ 88-89(AF).)  As already noted, the audio recording has not been submitted to the Court, and thus, obviously, the Court has not heard that to which plaintiff contends can be heard.  Instead, the Court has been presented with what hopefully is a heavily edited version of the audio recording. (*See* ECF No. 85-35 at 2.)  The purported transcript of the audio recording is one page, and contains summaries of just two telephone calls.  Apart from the fact that there are far more than two telephone calls on the soundless video presented to the Court, the transcript of the two calls is less than helpful in establishing that which plaintiff contends: that the two callers were not sent to voicemail.  (*See* ECF No. 91-1 at ¶ 89(AF).)  That being said, defendants do not directly refute plaintiff's statement that the audio recording of the two telephone calls indicates that callers were not sent to voicemail. (*See id*.)

Nevertheless, the Court does not believe that the evidence presented shows that which plaintiff contends, or, more importantly, that Hawley's decision to place plaintiff on administrative leave was implausible or contradictory.  The transcript of the first telephone call ends with the following: "Sorry the operator is not available.  Do not record a message for the operator.  This mailbox is full.  Hello, Cisco [community?] connections messaging system."  (ECF No. 85-35 at 2.) This does not seem the logical end to the message, seeing as "Hello" has just been used.  What comes next is unknown, but it certainly does not mean or suggest that a caller was not subsequently

disconnected. The transcript of the second telephone call is even shorter than the first, and ends with "This call will be answered in the order it was received. Please hold for the next available staff person." (*See id*.) Assuming that this was the end of the message, it certainly suggests more strongly than the first call that the caller was not immediately disconnected. However, it is still only one telephone call, and only one diverted telephone call at that. As such, it does not explain what happened to the telephone calls that plaintiff ignored or for which plaintiff picked up the receiver and then immediately put it back down.

In sum, based upon the entire record, the Court does not believe that plaintiff has shown that the evidence presented to Hawley (which appears to be O'Neil's belief of what the soundless video depicts) in making her decision to place plaintiff on administrative leave was so implausible or contradictory that a jury would be persuaded that the decision was made on some other basis. *See Rivera*, 365 F.3d at 925. As a result, defendants are entitled to summary judgment with respect to plaintiff's Title VII retaliation claim to the extent it relies upon her being placed on administrative leave or her termination.[54]

### B.    Plaintiff's Remaining Claims

Plaintiff spends an entirely cursory amount of time on her remaining claims. Of the 40 page response, just over 2 pages are spent on 3 separate sets of claims. (*See* ECF No. 85 at 38-40.)

### 1.    Rehabilitation Act Claims

---

[54] Defendants cite *Borwick v. T-Mobile West Corp.*, 535 F. App'x 650 (10th Cir. 2013) (*see* ECF No. 90 at 13-14), which may seem facially appealing because it appears to involve an employee hanging up on customers and the employer having a good faith belief that the employee had disconnected customers. *See Borwick*, 535 F. App'x at 652. Nonetheless, the Tenth Circuit's brief discussion of pretext reflects that the facts here are somewhat more favorable to plaintiff than those in *Borwick*. *See id*. Nonetheless, the Court has found that those more favorable facts—notably, when plaintiff should take calls in the queue and the audio recording—do not go as far as plaintiff contends and do not show that Hawley's decisions to place plaintiff on administrative leave or terminate plaintiff were implausible, incoherent, or contradictory.

Defendants concede that plaintiff can show two of four parts of a disability discrimination claim under the Rehabilitation Act. (ECF No. 72 at 18.) Defendants argue, though, that plaintiff cannot show she was otherwise qualified for the benefit sought, and she was discriminated against solely by reason of her handicap. (*Id*. at 18-22.) The Court agrees with defendants that plaintiff has failed to show that she was discriminated against solely because of her disability. To put it succinctly, there is absolutely no evidence that defendants discriminated against plaintiff due to her disability at *any point* in her employment. Plaintiff asserts in response that this claim is premised upon defendants' failure to follow her medical restrictions in scheduling her time on the telephone. (ECF No. 85 at 38.) As set forth in detail *supra*, however, plaintiff's disability played no part in that scheduling decision. As plaintiff herself argues, that decision was made in retaliation to her engaging in protected activity and/or due to religious discrimination. (*See id*. at 13-14, 18-19.)

Accordingly, defendants are entitled to summary judgment with respect to plaintiff's disability discrimination claim under the Rehabilitation Act. In addition, plaintiff fails to address at all any of defendants' arguments that they did not retaliate against or interfere with plaintiff, or create a hostile work environment due to her disability. Again, there is no evidence in the record of any sort that defendants retaliated against or interfered with plaintiff due to her disability, or that defendants created a hostile work environment due to plaintiff's disability. Therefore, the Court also finds that defendants are entitled to summary judgement with respect to any retaliation, interference, and/or hostile work environment claims plaintiff raised under the Rehabilitation Act.

### 2.    Family Medical Leave Act Claim

This claim is raised solely against O'Neil, and, previously, the Court reserved ruling on it at the motion to dismiss stage because it presented an issue—with respect to whether O'Neil could be

treated as plaintiff's employer—in which courts were split and the Tenth Circuit had not taken a side. (*See* ECF No. 75 at 20-21.)  The Court noted that the motion for summary judgment presented an alternative avenue to resolve the claim that did not weigh-in on the court split.  (*Id*.)  The Court now takes that avenue.

Retaliation claims under the FMLA are subject to the *McDonnell-Douglas* burden shifting framework.  *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006). This means that, to establish a prima facie case, a plaintiff must show that (1) she engaged in a protected activity, (2) her employer took an action that a reasonable employee would find materially adverse, and (3) there existed a causal connection between the two.  *Id*. at 1171.

Plaintiff alleges that she engaged in a protected activity "when she told O'Neil that she would not provide information concerning the specific medical condition her FML[A] leave was related to on her timesheet since, according to human resources, she was not required to do so."[55]  (ECF No. 85 at 39.)  Plaintiff cites to no case law to support her assertion that this was a protected activity (*see id*.), and the Court cannot discern why it would be, given that there is no explanation how telling O'Neil that she would not provide information was a right protected by the FMLA.  *See Peterson v. Exide Techs.*, 477 F. App'x 474, 476 n.1 (10th Cir. 2012) (noting that a FMLA retaliation claim requires a plaintiff to show that she exercised a right protected under the FMLA).  In other words, plaintiff fails to show that, by talking to O'Neil, she protested a practice made unlawful under the FMLA.  *See Wehrley v. Am. Family Mut. Ins. Co.*, 2013 WL 1092856, at *7-8 (10th Cir. Mar. 18, 2013) (explaining that protected activity includes requesting leave to which the employee is actually

---

[55] The Court notes that plaintiff failed to properly dispute defendants' factual statement that Human Resources requested that plaintiff inform the nature of her illness when she requested FMLA leave.  (*See* ECF No. 91-1 at ¶ 81; *see also* ECF No. 72-34 at 1.)

entitled as well as taking such leave); *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1006 (8th Cir. 2012) ("If an employee opposes any practice made unlawful under the FMLA—for example, if an employee complains about an employer's refusal to comply with the statutory mandate to permit FMLA leave—then the employer may not for that reason take adverse action against the employee who is engaged in the opposition.").

Plaintiff has also failed to show that O'Neil engaged in any adverse employment action. Plaintiff asserts that O'Neil disclosed her confidential medical information on her timesheet, stating that plaintiff was ill due to a stomach sickness, and issued a corrective action requiring her to disclose whether her leave was due to her stomach ailments.  (ECF No. 85 at 39.)  First, plaintiff again cites no law to support these assertions.  Second, to the extent O'Neil is an employer, an employer is allowed under the statute to ask its employee for notice of the medical condition necessitating FMLA leave. *See Nye v. City of Hoisington, Kan.*, 264 F. App'x 678, 682 (10th Cir. 2008) (explaining that an employee "must provide 'notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave.'") (quoting 29 C.F.R. § 825.302(c)); *Wilkins v. Packerware Corp.*, 260 F. App'x 98, 103 (10th Cir. 2008) (explaining that the FMLA protects an employee's leave only, for among other things, the employee's own serious health condition, making it impossible for her to work).

Accordingly, O'Neil is entitled to summary judgment with respect to plaintiff's FMLA retaliation claim.  In addition, plaintiff fails to contest defendants' arguments that she is not entitled to relief with respect to her FMLA interference claim.  (*See* ECF No. 85 at 39-40.)  Given that it is undisputed that O'Neil never refused to approve any of plaintiff's requests for FMLA leave (*see* ECF

No. 91-1 at ¶ 84), the Court finds that O'Neil is entitled to summary judgment with respect to any FMLA interference claim that plaintiff may have raised.

### 3.     The Settlement Agreement

Plaintiff dedicates all of one paragraph to her claim that CDE breached a settlement agreement between CDE and her.  (*See* ECF No. 85 at 40.)  Therein, plaintiff cites to no law supporting her claim, or to any evidence.  Instead, plaintiff states that CDE "has not come forward with any admissible evidence about the emails in question."  (*Id*.)  This argument, addressed previously at the start of the Factual Background section, relates to plaintiff's misplaced argument that Rule 56 requires authentication of exhibits.  (*See id*.)  As explained in detail *supra*, that is not the case.  Moreover, as explained *supra*, the Court has found that defendants will be able to present the pertinent exhibit in admissible form.  As such, the Court has been given no valid argument from plaintiff disputing defendants' argument that a settlement agreement was not reached in this case.

Independently, having reviewed the emails to which this issue appears to depend, the Court agrees with defendants.  Notably, although what appears to be counsel for CDE used the word "Deal," when asked if he would be interested in resolving plaintiff's case, that word was followed by "if I correctly understand what you're seeking."  (*See* ECF No. 72-28 at 17.)  Plaintiff's counsel then replied that she had not yet been able to speak to plaintiff.  (*Id*.)  This was followed two days later by another email from plaintiff's counsel asking for additional relief from defendants, or at least relief that does not appear to have been discussed previously.  (*See id*. at 16.)  Then, a day of that email, plaintiff's counsel sent another email, saying that plaintiff did not believe that "she has had enough time to consider resolution."  (*Id*. at 15.)  This was followed quickly thereafter with a

response from CDE's counsel, which, in less heated language, appears to question the negotiation tactics of plaintiff's counsel. (*See id.*) Thereafter, although CDE's counsel states that the parties had settled their dispute over plaintiff's case, that is simply not accurate in light of the emails that came before and came after, in which no agreement is ever reached, especially in light of the fact that both counsel appear to disagree as to which cases of plaintiff's cases had been settled. (*See id.* at 11 (email dated March 7, 2014 at 12:20 p.m. from plaintiff's counsel to CDE's counsel)).

Accordingly, CDE is entitled to summary judgment with respect to plaintiff's claim that CDE breached a settlement agreement.

## IV.    Conclusion

For the reasons discussed herein, the Court:

(1)    GRANTS in part and DENIES in part defendants' Motion for Summary Judgment (ECF No. 72) as follows:

    (a)    GRANTS the Motion for Summary Judgment with respect to plaintiff's claims under the Rehabilitation Act and the Family Medical Leave Act;

    (b)    GRANTS the Motion for Summary Judgment with respect to plaintiff's claim for breach of a settlement agreement;

    (c)    GRANTS the Motion for Summary Judgment with respect to plaintiff's claims under Title VII as follows:

        (i)    with respect to plaintiff's religious discrimination claim;

        (ii)    with respect to plaintiff's hostile work environment claim; and

      (iii)    with respect to plaintiff's retaliation claim solely as it pertains to: the March 14, 2014 Request for Action and Corrective Action; the April 27, 2014 Corrective Action; the April 2013 to March 2014 performance review; placing plaintiff on administrative leave; and terminating plaintiff's employment

(d)    DENIES the Motion for Summary Judgment with respect to plaintiff's retaliation claim under Title VII solely as it pertains to: scheduling plaintiff to a telephone schedule in violation of her work restriction; and the August 2013 written warning (which was initially a corrective action) for confidential information being in plaintiff's trash container.

**SO ORDERED.**

DATED this 24th day of March, 2017.

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge